# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE )
)
)
)
v. ) Case ID No.: 1204002559
)
)
KEVIN L. WILLIAMS, )
)
Defendant. )

## MEMORANDUM OPINION & ORDER

Submitted: March 26, 2018
Decided: June 29, 2018

*Upon Consideration of the Commissioner's Report and Recommendation on Defendant's Motion for Postconviction Relief,*

## ADOPTED.

*Upon Consideration of Defendant's Appeal from the Commissioner's Report and Recommendation on Defendant's Motion for Postconviction Relief,*

## DENIED.

Eric H. Zubrow, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for the State.*

Natalie S. Woloshin, Esquire, Woloshin, Lynch & Associates, P.A., Wilmington, Delaware. *Attorney for the Defendant.*

**MEDINILLA, J.**

## INTRODUCTION

Defendant Kevin L. Williams ("Defendant") filed an Amended Motion for Postconviction Relief under Delaware Superior Court Criminal Rule 61. He argues that his trial counsel was ineffective because he failed to file a Bill of Particulars and failed to object to the State's Motion to Amend the Re-Indictment. As to both contentions, Defendant maintains that counsel's alleged deficiencies resulted in violations of Defendant's Sixth Amendment and Due Process rights. After considering the multiple submissions associated with Defendant's Amended Motion, Defendant's Appeal of the Commissioner's Report, and the record in this case, the Court **ADOPTS** the Commissioner's Report and **DENIES** Defendant's Appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Factual Background*[1]

On November 10, 2011, Michelle Smith[2] brought her two daughters, Jean and Ava Smith, to speak to the Delaware State Police to report that Defendant had repeatedly sexually assaulted her daughters over the span of many years, throughout their childhood. The alleged victims are also Defendant's biological daughters.

---

[1] The Court's recitation is based on the testimony of Defendant's trial counsel and/or exhibits presented at the evidentiary hearing on May 31, 2017 before Commissioner Manning and on his Report dated October 30, 2017.

[2] Pseudonyms have been used throughout this case to protect the privacy of the victims and their mother.

1

Both girls were interviewed by the police, who documented the interviews in police reports. On December 12, 2011, both girls were additionally interviewed at the Child Advocacy Center ("CAC").

The eldest—then aged seventeen—is Jean, who reported that her first memory of a sexual assault took place when she was approximately eight years of age, in third grade. She recalled being on the couch at her Aunt's house on Fourth Street in Wilmington and fell asleep on Defendant's stomach/chest, as she would often do as a young child. On this occasion, she woke up to Defendant rubbing his private part (penis) against her private part (vagina).[3] Jean reported that Defendant had unzipped his pants and had pulled her underwear off to the side.[4] She explained that Defendant told her on their walk back home, "that's how everybody learns how to have sex."[5]

Although Jean reported this specific sexual incident, she disclosed that similar sexual assaults or encounters "happened all the time."[6] Defendant would regularly enter her bedroom during the night, kiss her neck, and rub his private part on her private part.[7] Jean reported that once she became older, it became "out of control."[8]

---

[3] Evidentiary Hr'g Ex. at B177.

[4] *Id.* at B177–B178.

[5] *Id.* at B178.

[6] *Id.* at B179.

[7] *Id.* at B180–B181.

[8] *Id.* at B181.

Jean described how Defendant would take off his clothes, touch her chest and buttocks with his hands, and ejaculate on her stomach.[9] Jean further recalled an incident in the kitchen of her home where Defendant forced her to touch his penis. She reported that this incident made her sick and that she had to run to the bathroom to throw up.[10]

The younger child, Ava, spoke to law enforcement when she was sixteen years old and divulged that Defendant began engaging in sexual acts with her when she was in seventh grade. She reported that one evening, after Defendant had chastised her for spending time with a girlfriend, he went in to her bedroom, locked the door, climbed on top of her, and tried to kiss her neck. However, Defendant heard Ava's mother coming down the stairs and jumped away before Ava's mother entered the room.[11]

Ava reported that she then had minimal contact with Defendant for approximately one year. However, Defendant repeatedly called her and requested that she go to the mall and have dinner with him. She complied. On one occasion, after they went shopping, Ava recalled an incident when they were walking home through Brandywine Park. She described in detail how Defendant pushed her on to

[9] *Id.* at B183–B186.

[10] *Id.* at B187–B188.

[11] *Id.* at B143–B144.

3

a picnic table, pulled his pants down, and attempted to sexually assault her. In the police reports and during the trial, this event became known as the "Monkey Hill" incident due to the location of the alleged assault.[12] Ava also described a separate incident when she was showering and Defendant made her touch his erect penis, while he stood outside the shower.[13]

On November 19, 2012, Defendant was indicted by a Grand Jury on nineteen counts of Unlawful Sexual Contact in the First Degree ("USC") and one count of Continuous Sexual Abuse of a Child.[14] As noted by the Commissioner, each of the nineteen counts of USC was worded identically and used the same date range: August 1, 2002 to June 30, 2003. All of the indicted counts concerned the same alleged child victim, Jean Smith.

Defendant was then re-indicted on March 4, 2013.[15] The re-indictment included the identical language for each count, but two of the counts of USC were changed to denote the second victim, Ava Smith. The date range for all charges, with the exception of the count for Continuous Sexual Abuse of a Child, were modified to cover different periods of time between August 1, 2002 and June 30,

---

[12] *Id.* at B036, B151–B155.

[13] *Id.* at B161–B163.

[14] *See* D.I. #2 (Nov. 19, 2012).

[15] *See* D.I. #14 (Mar. 4, 2013).

4

2008.[16] On May 31, 2013, the State again sought to make changes and filed a Motion to Amend the re-indictment.[17] The motion sought to amend the dates of counts 18 and 19.[18] The Motion to Amend was granted on June 10, 2013, without objection by trial counsel.[19]

Prior to trial, the State produced discovery to include the Affidavit of Probable Cause, redacted police reports, redacted Division of Family Services ("DFS") records, and the recorded CAC interviews.[20] Although the names throughout the reports were also redacted, trial counsel testified that he was able to identify the alleged victims with the assistance of Defendant.[21] On June 11, 2013, prior to the

---

[16] The re-indictment listed the following dates for each count: Count 1 – August 1, 2002 through June 30, 2003; Count 2 – August 1, 2004 through October 31, 2004; Count 3 – August 1, 2004 through January 31, 2005; Count 4 – August 1, 2005 through April 30, 2005; Count 5 – May 1, 2005 through July 31, 2005; Count 6 – August 1, 2005 through October 31, 2005; Count 7 – August 1, 2005 through January 31, 2006; Count 8 – February 1, 2006 through April 31, 2006; Count 9 – May 1, 2006 through July 31, 2006; Count 10 – August 1, 2006 through October 31, 2006; Count 11 – November 1, 2006 through January 31, 2007; Count 12 – February 1, 2007 through April 30, 2007; Count 13 – May 1, 2007 through July 31, 2007; Count 14 – August 1, 2007 through October 31, 2007; Count 15 – August 1, 2002 through January 31, 2008; Count 16 – February 1, 2008 through April 30, 2008; Count 17 – May 1, 2008 through July 31, 2008; Count 18 – August 1, 2007 through June 30, 2008; and Count 19 – August 1, 2007 through June 30, 2008.

[17] See D.I. #25 (May 31, 2013).

[18] The motion sought to amend the dates of count 18 from August 1, 2007 through June 30, 2008 to become May 1, 2006 through September 30, 2006 and the dates of count 19 from August 1, 2007 through June 30, 2008 to become September 1, 2009 through June 30, 2010.

[19] See D.I. #26 (June 10, 2013).

[20] Copies of the CAC interviews were sent to trial counsel on June 6, 2013 and marked as "received" by his office on June 10, 2013. Evidentiary Hr'g Ex. at B118. Trial counsel also received twenty-three pages of redacted DFS records at the same time.

[21] Evidentiary Hr'g Tr. at 25.

start of trial, the State entered a *nolle prosequi* on all but six counts of the amended re-indictment. The State therefore proceeded to trial on five counts of USC, three as to Jean Smith and two as to Ava Smith, and one count of Continuous Sexual Abuse of a Child relating solely to Jean Smith.

A jury trial was held from June 11 through June 14, 2013. Jean and Ava testified accordingly, and the Smith girls' allegations constituted the entirety of evidence presented at trial. Since both daughters were close in age and name, the evidence introduced to support the five charges were compartmentalized into named "incidents" in order to give the jury both the proper timeframes of when the alleged offenses were said to occur, but also to properly apply the named incident to the respective alleged victim/daughter. Defendant testified in his defense. He did not dispute that the events described by the girls were accurate, but rather flatly denied that any sexual contact occurred when he was with his daughters. The jury returned verdicts of guilty against Defendant on all counts.

On September 20, 2013, this Court sentenced Defendant to twenty-three years of unsuspended Level V supervision, followed by various levels of probation. Defendant's conviction was subsequently affirmed by the Delaware Supreme Court on August 21, 2014.[22]

---

[22] *See Williams v. State*, 100 A.3d 1022, 2014 WL 4179121 (Del. Aug. 21, 2014) (TABLE).

### *Procedural Background*

Defendant filed his *pro se* Motion for Postconviction Relief on January 12, 2015.[23]  On February 2, 2015, the Court sent a request for the Office of Conflicts Counsel to appoint counsel to represent Defendant on his pending motion.[24]  The Court then referred the Motion for Postconviction Relief to a Superior Court Commissioner.

After Defendant obtained appointed counsel for his Motion, he filed an Amended Motion for Postconviction Relief on April 18, 2016.[25]  Defendant's trial counsel submitted an affidavit responding to the allegations.[26]  The State responded to the Amended Motion on June 28, 2016.[27]  Defendant filed a reply to the State's Response on August 1, 2016.[28]  An evidentiary hearing was held on May 31, 2017, after which both parties also filed supplemental briefing at the Commissioner's request.[29]

---

[23] *See* D.I. #43 (Jan. 12, 2015).

[24] *See* D.I. #45 (Feb. 2, 2015).  Later, Defendant filed a *pro se* Motion for Appointment of Counsel. *See* D.I. #46 (Apr. 13, 2015).  The Court considered it moot as the Court had previously requested the appointment of counsel from the Office of Conflict Counsel. *See* D.I. #47 (Apr. 30, 2015).

[25] *See* D.I. #59 (Apr. 18, 2016) [hereinafter Am. Mot.]

[26] *See* D.I. #61 (June 9, 2016).

[27] *See* D.I. #63 (June 30, 2016).

[28] *See* D.I. #67 (Aug. 1, 2016).

[29] *See* D.I. #74 (July 20, 2017); D.I. #75 (Aug. 18, 2017).

On October 30, 2017, the Commissioner filed his Report recommending Defendant's Amended Motion be denied,[30] after conducting the appropriate analysis of Defendant's two claims under *Strickland v. Washington*.[31] The Commissioner determined that counsel's actions "did not prejudice [Defendant] in the end,"[32] and that he was "not convinced that there is a reasonable probability that the outcome might have changed had trial counsel done anything differently."[33]

On November 9, 2017, Defendant filed his Appeal from the Commissioner's Findings of Fact and Recommendations.[34] The State responded to Defendant's Appeal on March 12, 2018.[35] On March 26, 2018, Defendant filed a reply.[36] After considering all of the filings in Defendant's Motion and the record in this case, the Motion and Defendant's Appeal from the Commissioner's Report is ripe for decision.

---

[30] *See* Comm'r Report.

[31] 466 U.S. 668 (1984).

[32] Comm'r Report at 17.

[33] *Id.*

[34] *See* D.I. #77 (Nov. 9, 2017) [hereinafter Appeal].

[35] *See* D.I. #80 (Mar. 12, 2018) [hereinafter State's Resp.].

[36] *See* D.I. #82 (Mar. 26, 2018) [hereinafter Reply].

## STANDARD OF REVIEW

Rule 62 of the Delaware Superior Court Criminal Rules outlines the procedure for the Commissioner's review of motions.[37] Under Rule 62(a)(5), the Commissioner is permitted to conduct hearings into the motion and "submit to a judge of the Court proposed findings of fact and recommendations for the disposition, by a judge," of any such motion.[38] Upon receiving timely objections to the Commissioner's recommendations, the Court must make a *de novo* review of "those portions of the report" to which an objection is made.[39] The judge "may accept, reject, or modify, in whole or in part, the findings of fact or recommendations made by the Commissioner. Having received timely objections to the Commissioner's Report, this Court now conducts its *de novo* review.

## DISCUSSION

The right to counsel, enshrined in the Sixth Amendment of the United States Constitution and Article I, Section 7 of the Delaware Constitution, contains a correlative right to effective assistance of counsel.[40] This right extends to all "critical

---

[37] *See* DEL. SUPER. CT. CRIM. R. 62(a).

[38] *See* Rule 62(a)(5).

[39] Rule 62(a)(5)(iv).

[40] U.S. CONST. amend. VI; DEL. CONST. art. I, § 7. *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citing *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

stages" of the criminal case.[41]  In the postconviction setting, this right has been molded through generations of litigation involving a defendant's claim of ineffective assistance of counsel.  The seminal case on such claims is *Strickland v. Washington*.[42]  This case and its progeny established a two-part test: a defendant must show that, (1) "counsel's performance was objectively unreasonable," and (2) "the defendant was prejudiced as a result."[43]  The nuances of this test have been exhaustively distilled since *Strickland* was decided:

> Under the first prong [of *Strickland*], judicial scrutiny is 'highly differential.'  Courts must ignore the 'distorting effects of hindsight' and proceed with a 'strong presumption' that counsel's conduct was reasonable.  The *Strickland* court explained that 'a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'

> Under the second prong, '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'  In other words, 'not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.'  'Some errors will have a pervasive effect . . . , and some will have had an isolated, trivial effect.'  The movant must show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  The court must consider the 'totality of the circumstances,' and 'must ask if the [movant] has met

---

[41] *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012).

[42] 466 U.S. 668 (1984).

[43] *Sykes v. State*, 147 A.3d 201, 211 (Del. 2015) (citing *Strickland*, 466 U.S. at 694).

the burden of showing that the decision reached would reasonably likely have been different absent the errors.'[44]

Defendant's Amended Motion focuses solely on his trial counsel's failure to file or object in relation to the indictment, re-indictment, and the amended re-indictment. Defendant's Amended Motion claims two bases for relief under *Strickland*:

> Claim 1: Trial Counsel was ineffective in failing to file a bill of particulars in Mr. Williams' case, which resulted in a violation of Mr. Williams' Sixth Amendment and Due Process rights.[45]

> Claim 2: Trial Counsel was ineffective in failing to object to the motion to amend the indictment in violation of Mr. Williams' Sixth Amendment and Due Process rights.[46]

As stated above, the Commissioner rejected both of Defendant's claims under the second prong of *Strickland*—the "prejudice" prong. The Court does not deem it necessary to undergo a full first prong analysis under *Strickland* where the focus is Defendant asserting substantial prejudice. However, where trial counsel expressly testified that filing a Bill of Particulars would not have assisted him with the defense and he made a strategic decision not to do so, any failure to file was not objectively unreasonable, satisfying the first prong under *Strickland*. For the reasons stated

---

[44] *Id.* at 211–12 (internal footnotes omitted) (quoting *Strickland*, 466 U.S. at 689–90, 693–96; *Albury v. State*, 551 A.2d 53, 58 (Del. 1988)).

[45] Am. Mot. at 13.

[46] *Id.* at 19.

below, this Court agrees with the Commissioner's findings of fact and recommendations.

### *Claim 1 – Bill of Particulars*

A Bill of Particulars provides supplemental information when an indictment does not inform the defendant of the facts and charges against him to sufficiently enable the defendant to prepare for his defense.[47] It should "serve[] to protect a defendant against unfair surprise at trial and prevent subsequent prosecutions for an insufficiently described offense."[48] However, there are limitations. While a Bill of Particulars supplements or clarifies the allegations against the defendant, "it is not meant to compel the State to disclose the theory of the case or evidentiary information."[49] In other words, it does not serve as an alternative discovery device.

In his appeal, Defendant objects to the Commissioner's determination that *Dobson v. State*[50] and *Luttrell v. State*[51] could be distinguished from Defendant's case. Defendant contends that these Delaware Supreme Court cases decided after

---

[47] *State v. Block*, 2000 WL 706794, at *1 (Del. Super. Ct. Feb. 11, 2000).

[48] *Id.* (citing *Lovett v. State*, 516 A.2d 455, 467 (Del. 1986)); *United States v. Cantu*, 557 F.2d 1173, 1178 (5th Cir. 1977), *cert. denied*, 434 U.S. 106 (1978)).

[49] *Id.* (citing *United States v. Hajecate*, 683 F.2d 894, 897 (5th Cir. 1982); *State v. Strughold*, 973 S.W.2d 876, 890 (Mo. Ct. App. 1998)).

[50] 80 A.3d 959, 2013 WL 5918409 (Del. Oct. 31, 2013) (TABLE).

[51] 97 A.3d 70 (Del. 2014).

12

Defendant's trial are factually similar on the issue of failing to file a Bill of Particulars, and that their holdings should have been binding authority requiring post-conviction relief in this case.

The Court agrees with the Commissioner that *Dobson* and *Luttrell* are distinguishable from Defendant's case. Without repeating the Commissioner's extensive factual analysis, certain aspects of each case should be highlighted. In *Dobson*, the Supreme Court found that the defendant was substantially prejudiced by the defense counsel's failure to object to the State's presentation of testimony from the child victim concerning two additional, uncharged incidents of rape.[52] Compounding the problem was that defense counsel in *Dobson* did not know the specific factual allegations that formed the basis of each of the six identically worded counts of Rape in the Second degree, each covering a period of one year.[53]

Unlike in *Dobson*, here there were no additional incidents revealed to the jury that had not been previously disclosed to Defendant and his trial counsel.[54] However, the Commissioner found—and this Court agrees—that these "incidents" were not new or separate, but rather consistent with what Jean Smith had previously

---

[52] *Dobson*, 2013 WL 5918409, at *3.

[53] *Id.* at *1.

[54] *Id.* at *3.

13

described to the police or during the CAC interview, or both.[55] For example, the Commissioner determined that any details related to what was referenced at trial as the "Taron Hackett incident" were merely to provide additional details regarding the timeframe of one of the already known five charges. Any reference to Taron Hackett was only to provide a timeframe regarding the ongoing sexual abuse described at the CAC interview; Defendant began entering her room after Defendant met her boyfriend, Taron Hackett, for the first time. These details related to the charged incidents and were not new incidents that Jean testified to at trial.[56] Rather, additional facts came out through Jean's trial testimony that provided further context for acts which were previously disclosed.[57] The evidence presented at trial provided only more detailed background information or what the Commissioner described as "temporal reference points" for previously disclosed—and indicted—incidents.[58] Further, unlike in *Dobson*, trial counsel was aware of the five incidents and allegations made against Defendant.[59]

---

[55] Comm'r Report at 10–12.

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at 12.

Likewise, *Luttrell* is distinguishable from the facts of this case. There, the Supreme Court determined that reversal and a new trial were warranted where the trial court denied counsel's request for a Bill of Particulars and the defendant was not provided adequate notice of the charges against him.[60] Indeed, the Supreme Court found that neither defense counsel nor the jury were aware of what conduct constituted which charge on the indictment.[61] Although Defendant here takes issue with the timeframe of when discovery was turned over to trial counsel, it is undisputed on this record that trial counsel had substantially more information available to him than counsel in *Luttrell*.[62]

Had the State elected to proceed to trial on all nineteen USC counts in the re-indictment, then arguably the facts could be considered more comparable to those of *Luttrell*, as trial counsel may not have been aware of underlying facts or evidence that supported each of those counts. However, here, it is clear that through communications with the State, trial counsel was aware that the State would only be

---

[60] *Luttrell v. State*, 97 A.3d 70, 77–78 (Del. 2014).

[61] *Id.* at 77 (describing how "the State never explained to the jury which factual allegations aligned with which count of the indictment" and how the State admitted that information in the indictment, the probable cause affidavit, and recitation of the charges during the State's closing argument "didn't line up.").

[62] *Id.* at 77–78 (describing how "neither the indictment, nor any of the underlying materials [defendant] received provided sufficient information for him to understand for what particular conduct he was being prosecuted."). Further, any information that the defendant did receive in *Luttrell* contradicted other information and the dates contained in the indictment. *Id.* at 73–74.

going forward on five USC counts and well aware of the evidence expected to be introduced to support each of the five incidents.[63] As highlighted at the evidentiary hearing,

> Commissioner: So, and I don't want to put words in your mouth, but it sounds like what you're telling me is the DFS records you received the day before trial didn't help you figure out ultimately which specific incidents went to the five charges that actually went to trial?
>
> Trial Counsel: Well, I knew which charges were, the charges -- there were five specific incidents that I was aware of that we were defending against . . . . Some of these had been identified even with the initial police reports. Like I said, the girl down the street incident, the Monkey Hill incident, and then the falling asleep on the chest incident. They were pretty apparent from the beginning that these were instances. And to me, it would seem to be more important to discuss to discuss those specific incidences with Mr. Williams during our discussion. It wasn't like, "Gosh, if this happened in 2013, I wasn't around for that."[64]

Further, trial counsel made a strategic decision not to file a Bill of Particulars:

> I was dealing with him at arm's length. Sometimes there's a couple ways to go about doing things. And I had never gotten really any satisfaction from filing a Bill of Particulars other than having them denied. So I felt that I was making more headway by discussing things with [the State]. Because I was getting some answers, I was getting some responses. And the number of charges were ultimately . . . reduced significantly.[65]

---

[63] Evidentiary Hr'g Tr. at 59:01–22; 72:13–73:04; 80:13–83:13.

[64] *Id.* at 58:18–59:19.

[65] *Id.* at 80:01–13.

Additionally—unlike in *Luttrell*—the State provided a full explanation to the jury regarding what incidents corresponded to each charge in the indictment.[66] If anything, identifying the time frame of the events such as the "Monkey Hill" incident allowed the girls to recall the events as they remembered them and provide the jury with the appropriate timeframes for each of the five USC charges.

Furthermore, as for any claim that there was a failure on the part of the State to disclose the identity of Taron Hackett and whether his name would have been disclosed prior to trial if trial counsel had filed a Bill of Particulars, Defendant's Reply shows that any such prejudice is far attenuated from the act of filing. The Bill of Particulars would not have yielded the information Defendant claims may have been helpful to his defense. Trial counsel confirmed as much. The State is correct that "[a] witness' identity is not included in any Indictment, regardless of a Bill of Particulars"[67] and that the "[t]he State does not have a duty to disclose witness identities where their testimony is not exculpatory."[68] Defendant therefore attempts to clarify his position, but in doing so shows how far attenuated any prejudice would be. Defendant clarifies that "while Taron Hackett's name *may* not have been

---

[66] Am. Mot. App'x at A164.

[67] State's Resp. at ¶ 4.

[68] *Id.* (citing *Liket v. State*, 719 A.2d 935, 937 (Del. 1998)).

17

disclosed, trial counsel would have been put on notice of the existence of a witness *who may or may not* have collaborated the victim's testimony."[69]

This argument shows how far afield Defendant must go to show even potential prejudice. Defendant is no longer arguing that counsel's failure to file a Bill of Particulars prevented Defendant from obtaining the name of an additional witness—information that he would not have obtained. Rather, Defendant argues that clarifications and additional details about the incident in a Bill of Particulars *could* have placed Defendant on notice to the potential existence of an additional witness who may or may not have had any relevant information. This hypothetical argument does not constitute a "reasonable probability" that the outcome of the trial would have been different had trial counsel filed a Bill of Particulars.

Even assuming that trial counsel's election not to file a Bill of Particulars had fallen below "an objective standard of reasonableness," the showing of prejudice from this alleged deficiency is hypothetical, at best. Under *Strickland*, the burden of proving prejudice rests on the defendant to show a "reasonable probability" that, "but for counsel's unprofessional errors, the result of the proceeding would have

---

[69] Reply at ¶ 2 (emphasis added).

been different."[70] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[71] Defendant does not meet this burden.

Therefore, Defendant's showing of prejudice under *Strickland* is insufficient and, for the reasons stated above, the Court **ADOPTS** the Commissioner's Report as to this claim and **DENIES** Defendant's Appeal.

### *Claim 2 – Not Objecting to the Motion to Amend the Indictment*

Defendant's second claim is that trial counsel's failure to object to the Motion to Amend the Indictment violated *Strickland*. Defendant objects to the Commissioner's determination, "which exclusively relied upon trial counsel's testimony."[72]

As highlighted in the Commissioner's Report, trial counsel testified that the dates in the indictment had very little bearing, if any, on counsel's defense strategy. Trial counsel testified that he would have objected if he believed that the change in dates had impaired his defense in any way.[73] The Court agrees with the Commissioner that a change in dates may have been significant had Defendant

---

[70] *Albury v. State*, 551 A.2d 53, 58 (1988) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

[71] *Strickland*, 466 U.S. at 694.

[72] Appeal at ¶ 5.

[73] Evidentiary Hr'g Tr. at 104:23 –106:01.

offered a different strategy to his defense. For example, the dates would have been critical if Defendant was preparing to present alibi witnesses at trial. Defendant did not employ this strategy.

Instead, Defendant did not dispute the underlying *events* of any of these allegations, denying only that anything sexual had ever occurred.[74] Defendant himself testified to that effect at trial. Ultimately, the jury chose to accept the testimony of the Smith girls over his. Any change related to the dates would therefore have had no impact on the defense strategy.

Defendant argues that prejudice can be shown because "if trial counsel had objected there is a probability that the Court would have denied the State's motion which was made on the eve of trial" and that therefore "the defense could have prevailed on the charges based upon the State's failure to charge the offenses correctly."[75] This argument lacks merit.

Delaware Superior Court Criminal Rule 7(e) provides that "[t]he court may permit an indictment . . . to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."[76] The rule is designed to protect a defendant's right to notice of

---

[74] *Id.* at 83:23–86:06.

[75] Appeal at ¶ 5.

[76] DEL. SUPER. CT. CRIM. R. 7(e).

the charges against him and against double jeopardy.[77] Again, it bears repeating that trial counsel had communicated with the prosecutor and knew of factual underpinnings to each of the five USC charges that went forward to trial, and Defendant's arguments concerning the dates in the indictment had no bearing on the formulation of his defense.

The record also makes it clear that the State did not place the prior dates in the re-indictment to mislead Defendant and trial counsel. Rather, these changes reflect some of the difficulties of working with minor victims of sexual assault.[78] Forcing the State to proceed to trial on dates in the indictment that it then knew were inaccurate would be akin to the Court dismissing the indictment—an extreme remedy, only appropriate for the most severe of constitutional violations.[79] No Constitutional foul existed here and such a remedy would have been inappropriate. Therefore, the reasonable probability is that this Court would have denied any application for dismissal had it been made after the State properly made its application to amend.

---

[77] See Coffield v. State, 794 A.2d 588, 593 (Del. 2002); Keller v. State, 425 A.2d 152, 155 (Del. 1981).

[78] See e.g. Jeffrey H. Gallet & Maureen M. Finn, Corroboration of a Child's Sexual Abuse Allegation with Behavioral Evidence, 25 AM. JURIS. PROOF OF FACTS 3D 189, at §§ 7, 9 (2018) (describing common issues in prosecuting sexual abuse of a child, including victims' delayed reporting of alleged sexual abuse and trouble pinpointing when events occurred).

[79] See United States v. Morrison, 449 U.S. 361, 365 (1981) (describing dismissal of an indictment as "plainly inappropriate" in most cases, even for deliberate or extreme constitutional violations); Bailey v. State, 521 A.2d 1069, 1086 (Del. 1987).

21

Defendant, again, fails to meet his burden to demonstrate prejudice under *Strickland* for trial's counsel decision not to object to the State's leave to amend the re-indictment. Therefore, for the reasons stated above, the Court **ADOPTS** the Commissioner's Report as to this claim and **DENIES** Defendant's Appeal.

## CONCLUSION

The Court has conducted a *de novo* review of Defendant's Amended Motion and his Appeal of the Commissioner's Report. After this review, the Court **ADOPTS** the Commissioner's Report for the reasons stated above and in the Commissioner's Report. Defendant's Amended Motion for Postconviction Relief is **DENIED**. Consequently, Defendant's Appeal from the Commissioner's Findings of Fact and Recommendations is **DENIED**.

**IT IS SO ORDERED**.

Vivian L. Medinilla
Judge

oc: Prothonotary
cc: Defendant
 Department of Justice
 Office of Defense Services
 Investigative Services Office